**UNITED STATES of America, Appellee,**

v.

**Russell BUFALINO, Defendant-Appellant.**

**No. 846, Docket 81–1474.**

United States Court of Appeals, Second Circuit.

Argued March 23, 1982.

Decided June 15, 1982.

Nathaniel H. Akerman, Asst. U. S. Atty., S. D. N. Y., New York City (John S. Martin, Jr., U. S. Atty., S. D. N. Y., Mark F. Pomerantz, Asst. U. S. Atty., New York City, of counsel), for appellee.

Charles P. Gelso, Wilkes-Barre, Pa., for defendant-appellant.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and FRIEDMAN, Chief Judge, United States Court of Claims.*

FEINBERG, Chief Judge:

Russell Bufalino appeals from a judgment of conviction entered in November 1981 in the United States District Court for the Southern District of New York, Kevin T. Duffy, J., after a jury trial. Appellant's principal argument on appeal is that he was denied his statutory right to a speedy trial.

We find that this and appellant's other claims are without merit, and we affirm.

Briefly, the events leading to this appeal are as follows. In April 1976, appellant attempted to recover a $25,000 debt from Jack Napoli by threatening to kill him. Unfortunately for appellant, prior to their meeting, Napoli had taken the precaution of concealing a tape recorder on his body, and used it to record Bufalino's conversation. On the basis of Napoli's testimony, Bufalino was indicted for extortion. Anticipating that the government would call Napoli as a witness at trial, appellant arranged with a business acquaintance, James Fratianno, for Napoli's elimination. This arrangement was unsuccessful, possibly because Napoli had joined the Justice Department's Witness Protection Program and had been relocated and given a new identity. In any case, Napoli lived to testify at the extortion trial and Bufalino was convicted of extortion in August 1977 and was sentenced to four years in prison, see *United States v. Bufalino*, 576 F.2d 446 (2d Cir.), cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). While in jail, appellant again sought to murder Napoli, this time with the aid of another prisoner, Steven Fox, who was about to be paroled. This attempt also failed, but in December 1980, Bufalino was indicted for conspiring to obstruct justice. On April 2, 1981, this indictment was superseded by a second indictment charging Bufalino [1] with conspiring to violate the civil rights of a United States citizen, in violation of 18 U.S.C. § 241 (Count One), and endeavoring to obstruct justice, in violation of 18 U.S.C. § 1503 (Count Two).

At trial, James Fratianno, who was by this time also a member of the Witness Protection Program, and Steven Fox, who was in jail on other charges but had been offered the benefits of that program after his release, testified for the prosecution.

* Sitting by designation.

1. Michael Rizzitello was indicted with Bufalino and tried with him. The original indictment, charging both with conspiracy to obstruct justice, was superseded by the April 2 indictment which charged both appellant and Rizzitello with conspiring to violate Napoli's civil rights and Bufalino alone with endeavoring to obstruct justice. Rizzitello was acquitted.

Bufalino's defense was a general denial. Testifying in his own behalf, appellant denied that he intended to have Napoli killed for his role in the extortion prosecution. He also called several witnesses to contradict elements in the prosecution's case. In rebuttal, the Government played the tape recording of the threat on Napoli's life.[2] The jury convicted Bufalino on both counts, and he was sentenced to 10 years imprisonment and fined $10,000 on Count One and to a concurrent term of five years imprisonment and fined $5,000 on Count Two. Appellant claims that his conviction must be reversed because he was denied his statutory right to a speedy trial, inadmissible testimony was introduced at trial, and certain jury instructions were in error.

## I. Speedy Trial

Bufalino's speedy trial claim is based on events that occurred between his arraignment on January 9, 1981[3] and the trial, which began on October 19, 1981. Under the Speedy Trial Act, 18 U.S.C. §§ 3161 et seq., a defendant is entitled to have the charges against him dismissed[4] if he is not brought to trial within 70 days of arraignment, unless the excess days fall within a list of exclusions set out in § 3161(h).[5] Since Russell Bufalino was tried 283 days after he was arraigned, the issue before us is whether 213 of those days are excludable.

The government has presented us with several ways to reckon the excludable periods that arose in this prosecution. Its most forcefully urged alternative, which it presented at oral argument, involves excluding one day for Bufalino's co-defendant's bail hearing on January 13 under § 3161(h)(1)(J) [hereinafter "(J)"], two days for the weekend preceding the trial under Fed.R.Crim.P. 45(a); and 210 days for mo-

---

**2.** In the portion of the tape most damaging to Bufalino, he stated:

> [A]nd if you're going to do it, don't do the right thing, I'm going to kill you, [epithet omitted], and I'm going to do it myself, and I'm going to go to jail just for you. . . .

**3.** Bufalino was arraigned through counsel on January 9, 1981, and did not personally appear until May 8. Although an argument could be made that his speedy trial rights were tolled prior to his personal appearance, at a hearing before Judge Brieant on January 8, all the parties agreed that the speedy trial "clock" would begin to run as of the date Bufalino was arraigned through his attorney.

**4.** Section 3162(a)(2) provides:

> If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant. The defendant shall have the burden of proof of supporting such motion but the Government shall have the burden of going forward with the evidence in connection with any exclusion of time under subparagraph 3161(h)(3). In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice. Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a

> waiver of the right to dismissal under this section.

Because we affirm this conviction, we do not consider whether the factors present in this case would have mandated a dismissal with prejudice.

**5.** Section 3161(h) provides in relevant part that:

> (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
>
> (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—
>
> \* \* \* \* \* \*
>
> (F) delay resulting from any pretrial motion, from the filing of the motion, through the conclusion of the hearing on, or other prompt disposition of, such motion;
>
> \* \* \* \* \* \*
>
> (J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.
>
> \* \* \* \* \* \*
>
> (8)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of a defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

tion practice under § 3161(h)(1)(F) ["(F)"]. To arrive at this figure for motion practice, the government excludes the entire period from January 20, when defense counsel claims to have discussed a schedule for filing pretrial motions with Judge Duffy's law clerk, to July 28, when the court decided all the pending motions with the exception of the government's motion to sequester the jury. In addition, the government excludes the time from September 11, when it moved for a ruling on the admissibility of evidence relating to Bufalino's connections with La Cosa Nostra, to September 30, when that motion was decided.

Appellant objects to this calculation on several grounds. The most cogent of these is that (J) limits the amount of time excludable for the consideration of pretrial motions. Under that subsection, which is reproduced in note 5 supra, a maximum of 30 days is excludable when a "proceeding concerning the defendant is actually under advisement by the court." In this case, a first round of motions was fully submitted by March 24, and a second round (which was precipitated by the filing of a superseding indictment) was fully submitted by May 26. As a result, even if a full period of advisement is allowed for each set of motions, only 60 of the 126 days between March 25 and July 28 are excludable by reason of subsection (J). The Government reads the statute differently. It contends that (J) and (F) should not be read together, that (F)—which does not impose a numerical limitation on the time it excludes—is the only subsection that applies to pretrial motions, and, apparently, that (J) refers to other (unspecified) proceedings that could concern a defendant.

■ The application of (J) to the period of time during which a trial judge considers pretrial motions is an issue of first impression in this circuit, see *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 373 n.5 (2d Cir. 1979). While we think that a cursory reading of the two subsections lends some support to the government's position, a careful look at the legislative history of the Speedy Trial Act

and its 1979 amendments makes that theory untenable.

We start with the 1974 Act, which provided that:

(h) The following periods of delay shall be excluded ... in computing the time within which the trial of any such offense must commence:

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

\* \* \* \* \* \*

(E) delay resulting from hearings on pretrial motions;

\* \* \* \* \* \*

(G) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement.

Under the 1974 Act, subsection (E), which is the predecessor of current subsection (F), was limited in scope. It was apparently aimed at excluding only the days on which pretrial motions were argued in court, and not the days from the filing of the motion to the hearing thereon, see Frase, The Speedy Trial Act of 1974, 43 U.Chi.L.Rev. 667, 692 (1976). Subsection (G), the predecessor of (J), was intended to deal with delay that arose after pretrial motions were submitted, as the following passage from the House Report that accompanied the bill makes clear:

*Section 3161(h)(1)(g)* provides for the exclusion of time during which any proceeding concerning the defendant is under advisement. The Subcommittee added language which would limit to 30 days the time that each proceeding could be held under actual advisement. The amendment was adopted at the suggestion of Detroit defense attorney Mr. Barris, who said:

Now, I think the language which is now contained within the bill is that a reasonable time should be allowed when a matter is held under advisement by the district judge. This, of course, is a very flexible term, term

"reasonable," and I would suggest that a period of 30 days after all oral argument is heard and all briefs have been submitted on the matter under advisement is not an unreasonable period in which the district judge could act, I do not think that this would compel the judge to reach on any particular issue an improvident answer merely because he is held to a time limit of 30 days. And yet if such a provision or restriction were written into the Act, it would effectively plug up one of the loopholes which I conceive to now exist whereby a district judge were he prone to do so, could well "sit on a matter" for an indefinite period of time and thus rather effectively defeat the purposes of the bill.

The Committee concurs with the views of Mr. Barris and also with the Alaska speedy trial rules of court, which provides that no pre-trial motion shall be held under advisement for more than 30 days. This modification in no way affects the prerogative of the court to continue cases upon its own motion where, due to the complexity or unusual nature of the case, additional time is needed to consider matters before the court, as set forth in section 3161(h)(8).

H.R.Rep.No.93–1508, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Admin.News 7401, 7425–26.

By 1979, the courts had obtained some experience with the Act, and Congress chose to amend certain portions to reflect that experience. Subsection (G) apparently had not caused the courts any problems, and it was not changed in 1979, except for a change in lettering to (J). Subsection (E), however, had led to controversy, and Congress decided to reword it to make its meaning more precise. The accompanying reports are revealing as to legislative intent:

The provision of existing law relating to exclusion of periods of delay "resulting from hearings on pretrial motions" is revised to avoid an unduly restrictive interpretation of the exclusion as extending only to the actual time consumed in a pretrial hearing. The committee approves the expansion of this exclusion to "delay resulting from any pretrial motion, from the filing of the motion, through the conclusion of the hearing on, or other prompt disposition of, such motion" with the intention that potentially excessive and abusive use of this exclusion be precluded by district or circuit guidelines, rules, or procedures relating to motions practice.

H.R.Rep.No.96–390, 96th Cong., 1st Sess (1979), reprinted in 1979 U.S.Code Cong. & Admin.News 805, 814. And more significantly,

Finally, the section provides exclusion of time from filing to the conclusion of hearings on or "other prompt disposition" of any motion. This later language is intended to provide a point at which time will cease to be excluded, where motions are decided on the papers filed without hearing. *In using the words "prompt disposition", the committee intends to make it clear that, in excluding time between filing and disposition on the papers, the Committee does not intend to permit circumvention of the 30-days, "under advisement" provision contained in Subsection (h)(1)(J).* Indeed, if motions are so simple or routine that they do not require a hearing, necessary advisement time should be considerably less than 30 days. Nor does the Committee intend that additional time be made eligible for exclusion by postponing the hearing date or other disposition of the motions beyond what is reasonably necessary.

S.Rep.No.96–212, 96th Cong., 1st Sess. 33–34 (1979), reprinted in Federal Judicial Center, Legislative History of Title I of the Speedy Trial Act 115 (1980) (emphasis added).

These excerpts make it clear to us that the term "proceeding" in subsection (J) was very much intended to encompass pretrial motions. Furthermore, this view is reinforced by contemporaneous and informed administrative interpretation. The Administrative Office of the United States Courts

has issued guidelines to aid the courts in applying the Speedy Trial Act, which were prepared, in part, by the Committee on the Administration of the Criminal Law of the Judicial Conference of the United States. While these guidelines are not binding, the interpretation they espouse is persuasive. These guidelines state flatly that:

*(J) Proceedings Under Advisement*

*General.* This exclusion covers the time required for the court to consider a motion. Although the excludable period under this subparagraph is limited to thirty days, additional time required to consider a motion may in some cases warrant a continuance of the trial date under paragraph (h)(8).

*Starting Date.* The starting date is the day following the date on which the court has received everything it expects from the parties, examining physicians, etc., before reaching a decision. It is normally the date following the expiration of an exclusion under subparagraph (A), (B), (F), or (G).

*Ending Date.* The ending date is the earliest of (1) the date the judge's decision is filed, (2) the date the judge renders his decision orally in open court, or (3) the expiration of the 30-day maximum period.

Guidelines to the Administration of the Speedy Trial Act of 1979, as Amended 42–43 (1981). This interpretation is also reflected in the Administrative Office Speedy Trial Advisory Issuance # 32 (August 1981) at Chart B, page 3 ("Defendant Motion Under Advisement. The exclusion covers the time required for the court to consider a motion .... [T]he excludable period under this subparagraph is limited to thirty days ...."). Similarly, the 1979 Plan for the Prompt Disposition of Criminal Appeals of the United States District Court for the Southern District of New York noted that "in some instances docket clerks are not aware of when a judge takes a motion under advisement. This date is important as it starts excludable time running for up to 30 days under § 3161(h)(1)(J)." Plan at III–9. See also Misner, The 1979 Amendments to the Speedy Trial Act: Death of the Planning Process, 32 Hast.L.J. 635, 654–55 (1981).

Moreover, the scanty caselaw on the issue supports these administrative interpretations. It is true that the government cites two circuit court decisions to us for the proposition that the 30-day time limit of (J) is not applicable. However, it does not appear that either case is directly on point. For example, in *United States v. Brim,* 630 F.2d 1307 (8th Cir. 1980), cert. denied, 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981), it seems that the pretrial period extended for an inordinate length of time because the parties filed many consecutive motions and that at no time was a single motion under advisement for longer than 30 days. ("From [October 23, 1979], overlapping filings by the defendants and the government kept motions pending continuously until December 19, 1979, when the district court disposed of the motions remaining before it...." Id. at 1312.)[6] On the other hand, the Seventh Circuit considered the precise issue in *United States v. Raineri,* 670 F.2d 702 (7th Cir. 1982). There, motions were fully submitted by August 1, but the magistrate did not decide them until October 28, 88 days later. Apparently agreeing with the interpretation advanced by appellant here, that court held that "[i]t is reasonable to attribute and exclude *thirty of the days* between August 1 and October 28 to the motions under advisement." Id. at 708 (emphasis added); cf. *United States v. Molt,* 631 F.2d 258, 262 (3d Cir. 1980) (per curiam).

Based upon all of the above, therefore, we reject the government's position that

---

**6.** In the other case relied on by the government, *United States v. Regilio,* 669 F.2d 1169 (7th Cir. 1981), it is unclear whether the court had the motions under advisement for over 30 days or whether overlapping motions were filed in a way that prolonged the pretrial period. In a later case, however, *Regilio* was cited by the Seventh Circuit after it stated that it would exclude only 30 pretrial days under (J). *United States v. Raineri,* 670 F.2d 702, 708 (7th Cir. 1982), discussed in the text infra.

the 30-day limitation of subsection (J) is inapplicable.[7] We are aware that this interpretation places a burden on district judges to decide motions rapidly. We believe, however, that it carries out the meaning of the Act. Furthermore, should the 30-day limit place an unduly harsh burden on a trial judge, it is always open to him to find that the interest of justice is best served by granting a continuance under § 3161(h)(8) for the excess period, see H.R. Rep.No.93–1508, supra.

■ The government argues also that defendants' failure to respond to the government's sequestration motion renders the entire period from the time that the motion was filed to the date of trial excludable under subsection (F). The sequestration motion had been filed on March 27, but neither Bufalino nor his co-defendant, Rizzitello, responded to it. On September 30, during a pretrial conference, the judge asked counsel if they objected to sequestration and, after expressing his own reservations about the practice, stated that he would not do it unless the defense counsel joined in the government's motion.[8] Although at that time neither counsel objected to sequestration, Rizzitello's attorney refused to join in the motion without further discussion with Bufalino's counsel. The matter was again brought up by the court on October 19, the date that the trial began. At that time, the following interchange took place:

THE COURT: I will once again state that I'm not crazy about sequestered juries. However, I gather that everybody wants a sequestered jury in this case.

MR. COHEN [attorney for Rizzitello]: Your Honor, excuse me.

I contacted your chambers on that day when we had the conference and indicated we didn't take any position.

THE COURT: Not taking a position is a kind of indication that you don't disagree with the motion, which is kind of like saying we'll have a sequestered jury.

Under the circumstances I will assume that everybody in this case is willing to work much harder than normally, and under the circumstances we are going to work harder.

In view of these facts, we believe that the government's argument to us on this point has merit. Because Judge Duffy was opposed to sequestration, his decision on the government's motion hinged on the defendants' positions towards it. If either one had shared his views of the dangers in sequestration, it is not unlikely that the government's motion would have been denied. Consequently, Judge Duffy could not have taken this motion under advisement in any meaningful way until the defendants made their positions known. Moreover, administration of the Speedy Trial Act has posed difficulties, as the Southern District's summary of its experience indicates, see South-

7. It is therefore unnecessary to reach appellant's objections to the date upon which the government contends that the (F) exclusion begins. Bufalino claims that the scheduling of pretrial motions was not formally begun until January 22. More important, appellant maintains that the exclusion does not begin until motions are actually filed, which was March 9 in this case.

8. The September 30 colloquy, as it pertained to the sequestration motion, was as follows:

THE COURT: The only thing which is of long standing is the motion to sequester the jury. That is number one.

Does anyone object to the motion to sequester the jury?

You do?

MR. COHEN [attorney for Rizzitello]: No, your Honor.

THE COURT: You agree that the jury should be sequestered?

MR. GELSO: I do on behalf of Bufalino.

MR. COHEN: I have no objection.

THE COURT: I tell you, I assume you guys have thought about it, that is like notifying the jury that we have "dangerous people floating around someplace."

MR. GELSO: I would hope the Court would give an appropriate instruction.

THE COURT: I don't care what I do. They are going to sit in a motel and think about it. I am against sequestering a jury. And as of now I won't do it unless all three of you join in and sequester them.

MR. COHEN: I am going to meet with Mr. Gelso after we leave here. We haven't had time to talk about this. We will give your Honor our feelings on this, perhaps this afternoon.

ern District Plan, supra, III. Over 750 criminal cases were filed in the Southern District in the year ending June 30, 1981, see Administrative Office of the United States Courts, Management Statistics for 1981 at 26 (1981), far too many for it to be reasonable to require the clerks or the judges to guess each party's position on his adversary's motions in order to calculate times under the Speedy Trial Act. Cf. Misner, supra at 643 n.65. It seems to us that Bufalino, when faced with a government motion, had a duty to do more than stand by without taking a position and then reap the benefit of inaction by having the indictment dismissed on speedy trial grounds.

In finding that (F) applies to the entire period that followed the filing of the government's sequestration motion, we do not mean to say that appellant's failure to respond works as a waiver of his rights. The responsibility for pursuing a prosecution lies entirely with the government, *Barker v. Wingo*, 407 U.S. 514, 527, 92 S.Ct. 2182, 2190, 33 L.Ed.2d 101 (1972) ("A defendant has no duty to bring himself to trial ...."); *New Buffalo Amusement Corp.*, 600 F.2d at 375–76; *United States v. Didier*, 542 F.2d 1182, 1189 & n.9 (2d Cir. 1976). Cf. *United States v. Salzmann*, 548 F.2d 395, 401 (2d Cir. 1976). We must, however, insure the ability of the courts to administer the Act. If defendants do not make their positions known in response to the motions that are made, neither the court nor its clerk's office will ever know when the "under advisement" period of subsection (J) begins to run. The Act was not, after all, meant to provide defendants with tactics for ensnaring the courts into situations where charges will have to be dismissed on technicalities. *Regilio*, 669 F.2d at 1173; cf. *Furlow v. United States*, 644 F.2d 764, 768 (9th Cir.) (per curiam), cert. denied, 454 U.S. 871, 102 S.Ct. 340, 70 L.Ed.2d 175 (1981). In addition, we caution the Government that we will not in the future condone its willingness to stand silent in similar situations. As *Barker v. Wingo*, 407 U.S. at 527, 92 S.Ct. at 2190, makes clear, the government is charged not only with preserving society's interest in bringing criminals to justice; it is also charged with protecting society's interest in swift prosecutions. In the future, a defendant's failure to respond to a motion within a reasonable time should be brought to the court's attention.

Because we find that the entire period from March 27 to October 19 is excludable under subsection (F), we do not reach the government's alternative theories for calculating the exclusion.[9] Taking the approach most favorable to appellant on the question of when motion practice began under subsection (F),[10] Bufalino was tried 59 days after his arraignment, well within the 70-day period allowable under the Speedy Trial Act.

## II. Rulings on Evidence

■ Appellant's claims with regard to the evidence introduced at trial are without merit. First, he argues that the trial court should not have allowed the government to cross-examine him about his friendships with members of La Cosa Nostra or about his presence in Apalachin on November 14, 1957.[11] While we agree that this line of

---

9. The government also argues that speedy trial time should not begin to run until Bufalino appeared in person on May 8, see note 3 supra; that excludable time begins from the moment that the court determines that pretrial motions would be needed (here, January 9); and that Bufalino's September 30 motion for a continuance waived his speedy trial rights. In addition, the government asserts that the time from October 5, when the trial was scheduled to begin, to October 19, the date upon which it actually began, is excludable under § 3161(h)(8) because Judge Duffy was busy trying another case. Although (h)(8) requires the trial court to make a finding "that the ends

of justice ... outweigh the best interest of the public and the defendant in a speedy trial," the government maintains that we can make this finding *nunc pro tunc*.

10. See notes 7 & 9 supra. Under this approach, the entire time from January 9, when defendants were arraigned, to March 9, when motions were filed, is counted toward the 70-day statutory period.

11. Appellant's presence at the notorious La Cosa Nostra convention in Apalachin was the subject of his prosecution for conspiracy to obstruct justice and commit perjury. His con-

interrogation poses the danger of allowing the jury to find Bufalino guilty by virtue of his association with known gangsters and his presence at a famous gangland convention, we feel that the cross-examination was proper.

The theory that the government presented to the jury was that Bufalino could prevail upon James Fratianno to have Napoli killed because both were members of La Cosa Nostra, an organization whose members performed murders for one another as a matter of professional courtesy. When, on direct examination, Bufalino claimed that his acquaintance with Fratianno was based on "chance meetings," it became proper for the government to impeach him by introducing evidence of appellant's longstanding relationship with La Cosa Nostra, see *United States v. Havens*, 446 U.S. 620, 626, 100 S.Ct. 1912, 1916, 64 L.Ed. 2d 559 (1980) ("[W]hen defendants testify, they must testify truthfully or suffer the consequences."); *United States v. Miller*, 478 F.2d 1315, 1318 (2d Cir.), cert. denied, 414 U.S. 851, 94 S.Ct. 144, 38 L.Ed.2d 100 (1973). Furthermore, since without this evidence it was unlikely that the jury would believe that Fratianno would agree to commit the crime, we think the trial judge properly exercised his discretion to allow the cross-examination of defendant to proceed, see *United States v. Sanzo*, 673 F.2d 64, 70 (2d Cir. 1982).

▆▆ Bufalino's other evidentiary objection is that the tape recording of the extortion threat should not have been admitted because it was highly prejudicial. The general rule is that "other crimes" evidence "is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Fed.R.Evid. 404(b). Such evidence of "other crimes" is, however, permissible for purposes of impeachment, *United States v. Benedetto*, 571 F.2d 1246, 1250 (2d Cir. 1978), and to show motive or intent, Fed.R.Evid. 404(b), *United States v. Bradwell*, 388 F.2d 619, 622 (2d

viction on those charges was reversed by this court, *United States v. Bufalino*, 285 F.2d 408

Cir.), cert. denied, 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968). In this case, the tape recorded threat served the double purpose of negating Bufalino's testimony that he never told anyone to kill Napoli and establishing his motive for seeking Napoli's death. Moreover, Judge Duffy gave the jury two curative instructions. Right after the tape was played, the jury was told to disregard the obscenities it contained. More importantly, in his charge, the judge said:

> [Y]ou heard a tape ... of what the defendant Bufalino said on one occasion to Jack Napoli. You know that Bufalino has already been convicted of making that threat. You are not called upon to consider that tape that you heard as anything except something which may assist you in determining the question of intent in this case, only in connection with that.

We think that this charge was sufficient to alert the jury to the danger of improperly using the tape as evidence that Bufalino endeavored to obstruct justice. Admission of the tape therefore was not reversible error.

### III. The Judge's Charge

Finally, Bufalino objects to the court's failure to give the accomplice instruction that Bufalino requested. Fratianno and Fox, the two principal witnesses for the prosecution, both received—or stood to receive—substantial benefits from the government. Fratianno received a favorable plea bargain on another charge, immunity from prosecution on the criminal activities that he testified about and approximately $200,000 as part of the Justice Department's Witness Protection Program. Fox expected to receive early parole and an opportunity to participate in the Protection Program. Although this information was brought out at the trial, the judge's charge on how their testimony should be evaluated was somewhat equivocal. Specifically, he instructed the jury as follows:

(2d Cir. 1960).

**648**

If you find ... that an informer believes that he has a real interest in the outcome of this case, then you can consider that, also, in determining his credibility.

For example, if a person here, informer believes that his term of imprisonment may be shortened, not because of his testimony but because of the outcome of the case, all right, then he has a real interest in the outcome of the case. He might be said to have an interest anyway in the case from the very fact that he is testifying.

I am not saying and I don't want you to understand that the law imposes this, I am not saying that because a person has an interest that means that they would testify falsely, I am just saying it is something for you to consider. It is something that you determine what weight it will have.

■ This instruction was arguably inadequate because it asked the jury to devalue Fox's and Fratianno's testimony only if the jury found that their receipt of benefits was contingent on the conviction of Bufalino. We have stated in the past that "trial judges should call the jury's attention to their duty to scrutinize the testimony of accomplices and informers." *United States v. Swiderski*, 539 F.2d 854, 860 (2d Cir. 1976). This admonition applies to all factors affecting credibility that have been brought out at trial, not merely an interest in the outcome of the case. We do not, however, find that this possible inadequacy in the charge requires a reversal of Bufalino's conviction. The jury received ample evidence of the interest of these witnesses, and could be counted on to use its common sense in evaluating the truth of their testimony. Besides, the defense summation—which referred to Fratianno as a "chronic pathological liar" to whom the government paid $200,000 "that might buy a lie"—more than compensated for the judge's omission. See *United States v. Velez*, 652 F.2d 258, 261 n.5 (2d Cir. 1981).

For the foregoing reasons, the judgment of conviction is affirmed.